The Honorable Barbara J. Rothstein

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KIT LEE,

      Plaintiff,

v.

AMGUARD INSURANCE COMPANY

      Defendant.

Civil Action No. 3:20-cv-1634-BJR

ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT

## I.    INTRODUCTION

This is an insurance dispute between Plaintiff Kit Lee ("Lee") and Defendant AmGuard Insurance Company ("Defendant"). Lee alleges causes of action for declaratory judgment, breach of contract, bad faith, and violations of the Washington Consumer Protection Act ("WCPA") and the Washington Insurance Fair Claims Act ("IFCA"). Currently before the Court is Lee's motion for partial summary judgment on the bad faith and IFCA claims. Dkt. No. 18. Defendant opposes the motion. Dkt. No. 20. Having reviewed the motion and opposition thereto, the record of the case, and the relevant legal authority, the Court will grant the motion. The reasoning for the Court's decision follows.

## II. BACKGROUND

The following facts are undisputed unless otherwise noted. Lee owns a seven-unit apartment building located in Seattle, Washington, and the monthly rental income from the building is Lee's main source of income.[1] At all times relevant to this lawsuit, the building was insured by a Defendant-issued insurance policy that provides coverage for physical loss or damage to the building, lost rental income for up to 12 months, and liability coverage with a defense obligation.

On November 7, 2019, a fire broke out in the building, causing extensive damage to five of the units, stairwells, a sprinkler room, and the parking garage, and more than half of the building tenants had to be relocated due to the damage.[2] Lee reported the fire to Defendant on the day of the incident and Defendant acknowledged the loss in a letter dated November 11, 2019.

This lawsuit stems from Defendant's handling of Lee's insurance claim related to the fire. The insurance claim has three components—the cost of fire and water damage mitigation work, the cost of reconstruction, and the lost rental income—each of which is set forth in more detail below.

### A. The Cost of Fire and Water Damage Mitigation Work

Defendant retained Engle Martin & Associates ("EMA") to investigate and adjust Lee's claim under the policy. As part of its duties, EMA sent Defendant monthly reports that included loss estimates, investigation results, recommendations, proposed next steps, and claim documentation. *See, e.g.*, Dkt. No. 19, Ex. 8. Lee contacted EMA shortly after the fire and EMA

---

[1] There is a discrepancy in the record as to how many units are in the building. Lee claims there are seven, but other documents in the record indicate otherwise. *See, e.g.*, Dkt. No. 19, Ex. 8 at 3 referring to a "13 unit" building; Dkt. No. 20 at 2 referring to "six apartment units".
[2] The fire was caused by a faulty dryer vent.

advised Lee to hire a mitigation company "to come in and clean up the mess." *Id*. at Ex. 2 ¶ 3. Thereafter, with Defendant's and EMA's approval, Lee retained Servpro, a local damage repair and cleanup specialist, to perform the work. *Id*.; Dkt. No. 20 at 2. Servpro completed the task on December 16, 2019 and sent Lee an invoice for $131,895.46. EMA included the invoice in its December 30, 2019 and January 31, 2020 reports to Defendant, recommending that Defendant pay the invoice. Dkt. No. 19, Ex. 8. Defendant did not respond to the reports.

ServPro emailed Defendant several times regarding the outstanding invoice, but never received a response. *See* Dkt. No. 19, Ex. 1 at 33: 5- 34:24 (referencing correspondence sent on December 10, 2019, and January 29, February 5, and February 7, 2020). On February 27, 2020, ServPro wrote the following to Defendant:

> Servpro has tried numerous times to reach you by email and by phone with no return response. We're approaching our lien date and would like to resolve the issue regarding payment for mitigation services. The insured is also eager to begin reconstruction services, but this had been on hold due to lack of communication from [Defendant]. Please reply with an update or contact our office.

*Id*. at 33: 8-14. Defendant did not respond. *Id*. at 33:20-24. On March 19, 2020, Servpro filed a lien for $131,895.46, plus fees and interest against Lee's property.

Finally, in April 2020, Defendant tasked one of its internal adjustors to audit ServPro's invoice, which the adjustor completed on May 11, 2020. Dkt. No. 19, Ex. 6 at 7:21-912. The adjustor concluded that Defendant would pay only $72,581.17 of the $131,895.46 invoice. Dkt. No. 19, Ex. 9. Lee was not notified of this decision, nor did Defendant issue a payment right away; instead, Defendant waited over two months to issue payment. Dkt. No. 19, Ex. 1 at 52:18-21. Defendant provides no explanation for the delayed payment.

Lee was becoming increasingly more desperate during the two-month delay. On July 22, 2020, he emailed Defendant's adjustor: "I haven't heard from you since last time we spoke. Let

me ask you this: Are you trying not to pay for my claim? Otherwise, what's the reason for the delay? … As per my previous email, rental income is my main source of income. The last few months of loss really put me in financial difficulty. I was living on credit cards." Dkt. No. 19, Ex. 1 68: 1-8. The adjustor never responded to this email. *Id*. at 68:11.

On August 3, 2020, Lee finally received a check for $127,256.63 from Defendant.[3] Dkt. No. 19, Ex. 11. Because this amount was insufficient to satisfy the lien, on November 12, 2020, ServPro filed suit against Lee in King County Superior Court to foreclose on the lien. Lee tendered the lawsuit to Defendant on November 16, 2020. Defendant acknowledged the tender but failed to retain defense counsel on behalf of Lee for several months. Finally, after repeated requests, Defendant retained attorney Jenna Mark to handle the lawsuit.

Like Lee, EMA, and ServPro before her, Ms. Mark also had a difficult time communicating with Defendant, as is evidenced by the following email she wrote to Lee's current attorney on May 21, 2021:

> Following up on this matter. I am desperately trying to present a meaningly defense for Kit Lee in response to this matter brought by Servpro, but to date and despite what feels like dozens of phone calls and emails to [Defendant] to discuss this case, I have had absolutely zero contact with [Defendant]. [Defendant] retained my firm for the defense of Mr. Lee in January and to date I have never received a single email, phone call, or shred of documentation from [Defendant] on this file. I have even gone so far as to contact other team members of the adjuster, I have contacted several supervisors of this adjustor – nobody has responded to me. I am doing my best to defend Mr. Lee but I genuinely cannot do so without the participation of [Defendant]. [Defendant] has effectively tied my hands at this point and has not granted me authority to settle or even retain experts to defend. Please let me know if there is anyone on the coverage end that can possibly help me get [Defendant] involved here. I am very concerned about the status of this matter. At this point there is little to no defense to this claim without [Defendant].

---

[3] This amount included the $72,581.17 that Defendant was willing to pay for ServPro's mitigation work as well as $110,264.51 for reconstruction expenses, less $9,589.05 for depreciation, a $1,000 deductible, and the $45,000 advance, all of which is explained in detail in the following section.

Dkt. No. 19, Ex. 12. Twenty-one months after Servpro first invoiced Lee for its mitigation services, Defendant settled the lawsuit with Servpro for $190,581, almost $60,000 above what Servpro initially billed Lee.

### B. The Cost of Reconstruction Work

As stated above, Lee's main source of income is the rental income he receives from the building. Dkt. No. 19, Ex. 2, ¶ 10. Understandably, he was anxious to begin reconstruction work on the building so that his tenants could move back into their units. To that end, in its December 30, 2019 report to Defendant, EMA recommended that Defendant pay $131,595.58 to Lee to cover the cost of reconstruction. Dkt. No. 19, Ex. 8. As stated above, Defendant did not respond to the report, so on January 21, 2020, Lee's insurance agent emailed Defendant requesting an update on the claim. Dkt. No. 19, Ex. 14. Defendant did not respond to the email. On January 31, 2020, EMA sent another report to Defendant again recommending that it pay Lee $131,595.58 to cover the cost of reconstruction. Dkt. No. 19, Ex. 8. Again, Defendant did not respond to the report. Instead, on March 16, 2020, Defendant sent Lee a check for $45,000 with a note that simply stated: "Building Repairs Advance".

Lee was unclear what to do with the $45,000 as it did not cover the cost of ServPro's outstanding invoice nor the proposed reconstruction work, so between March 16 and June 29, 2020, Lee wrote to Defendant at least four more times seeking clarification and requesting a status report on his claim. The only response Lee ever received was an April 24, 2020 email in which Defendant apologized for the delay and advised that the claim was still under review but that the review should be complete by the end of that day. Dkt. No. 19, Ex. 16. When Defendant failed to get back to him, Lee emailed on April 29, May 1, and May 19, 2020, again asking for an update on his claim. *Id*.; Dkt. No. 19, Ex. 1 at 59:1-12. Defendant never responded to the emails.

However, unbeknownst to Lee, on May 11, 2020, Defendant approved $100,675.45 for reconstruction costs. Dkt. No. 19, Ex. 1 at 52:5-8. Lee was never informed of this decision. Instead, Lee and EMA continued to repeatedly email and call Defendant asking for funds without response so, on July 15, 2020, EMA wrote to Defendant: "As there has been no response to Mr. Lee's repeated requests for a status update, he will likely be seeking legal counsel soon." Dkt. No. 19, Ex. 22. This threat of legal action finally prompted Defendant into action. The same day Defendant received the foregoing email, a supervisor emailed the internal adjustor handling Lee's claim: "This needs to be handled asap. Looks like estimates were approved in May, not sure why this wasn't paid yet…." Dkt. No. 19, Ex. 23. Finally, two weeks later, on July 29, 2020, Defendant sent Lee the check for $127,256.63, which he received on August 3, 2020. Defendant claimed that the check represented $110,264.51 for reconstruction costs, $72,581.17 for Servpro's mediation work, less $9,589.05 for depreciation, $1,000 for deductible, and $45,000 for the advance sent in March 2020.

    **C.**    **Lost Rental Income**

As stated above, the fire rendered five of the seven units in the building unusable and those tenants had to be relocated. In its January 2020 report to Defendant, EMA estimated that Lee's rental income loss was $7,425 per month and recommended that Defendant pay Lee four months' rent for November 2019 through February 2020 (at this point, EMA assumed that the building repairs would be complete by the end of February 2020). Defendant failed to respond to this recommendation. Each month thereafter, EMA sent Defendant a report updating the amount that it recommended Defendant pay Lee for the lost rental income: the May 2020 report recommended that Defendant pay Lee $66,825 for nine months of lost income; the June 2020 report recommended $74,250 to cover ten months; and the July 2020 report recommended

$81,675 to cover eleven months of lost rent. See Dkt. No. 19, Exs. 18, 21-22. Defendant never responded to any of these reports.

Between January 2020 and July 2020, Lee repeatedly emailed EMA and Defendant asking for an update on his loss of rental income claim. Finally, on July 27, 2020, Defendant informed him that it had retained an accounting expert, TD Davidson, to calculate Lee's rental income losses. On September 10, 2020, TD Davidson recommended that Defendant pay Lee $83,540 to cover twelve months of lost rent. Dkt. No. 19, Ex. 35. On April 21, 2021—seventeen after the fire—Defendant paid Lee $118,000 to cover sixteen months of lost rent.

### III.   STANDARD OF REVIEW

"The standard for summary judgment is familiar: 'Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact.'" *Zetwick v. County of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017) (quoting *United States v. JP Morgan Chase Bank Account No. Ending 8215*, 835 F.3d 1159, 1162 (9th Cir. 2016)). A court's function on summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If there is not, summary judgment is warranted.

### IV.   DISCUSSION

Lee moves this Court for summary judgment on two of his five claims: (1) the common law bad faith claim and (2) the Washington Insurance Fair Claims Act ("IFCA") claim. The Court will address each claim in turn.

### A. The Common Law Bad Faith

Lee argues that Defendant's unresponsiveness, delayed payments, and failure to investigate his insurance claim constitutes a breach of the duty of good faith it owes him. Specifically, he argues that Defendant acted in bad faith by: (1) unreasonably delaying payment for ServPro's mitigation work to the point that Lee was forced to defend himself in litigation, (2) impeding reconstruction of the building by causing a lien to be placed on the building and failing to advance funds for the work, (3) failing to pay his lost rental income for over a year, and (4) failing to respond to phone calls, letters, and emails related to his claim.

"The duty of good faith …permeates the insurance agreement." *St. Paul Fire and Marine Ins. Co. v. Onvia, Inc.*, 196 P.3d 664, 667-668 (Wash. 2008) (noting that "both Washington courts and the [Washington] legislature have consistently imposed a duty of good faith on the insurance industry"). An action for bad faith handling of an insurance claim under Washington law sounds in tort. *Safeco Ins. Co. of America v. Butler*, 823 P.2d 499, 503 (Wash. 1992). "Claims by insured against their insurers for bad faith are analyzed by applying the same principles as any other tort: duty, breach of that duty, and damages proximately caused by any breach of duty." *Smith v. Safeco Ins. Co.*, 78 P.3d 1274, 1277 (Wash. 2003). To succeed on a bad faith claim, "an insured is required to show the breach was unreasonable, frivolous, or unfounded." *Id.*; *Heide v. State Farm Mutual Automobile Ins. Co.*, 261 F. Supp. 3d 1104, 1109 (W.D. Wash. 2017). Whether an insurance company's behavior constituted bad faith is a question of fact, typically reserved to the jury. However, this "does not preclude summary judgment in the appropriate circumstances: 'Questions of fact may be determined on summary judgment as a matter of law where reasonable minds could reach but one conclusion.'" *Scanlong v. Life Ins. Co. of North America*, 670 F. Supp.

2d 1181, 1194 (quoting *Smith*, 78 P.3d at 1277); *Rizzuti v. Basin Travel Service of Othello, Inc.*, 105 P.3d 1012, 1019 (Wn. App. 2005) (same).

In addition, the Washington State Legislature through RCW 48.30.010 authorized the Washington State Insurance Commissioner to promulgate regulations that define "specific acts and practices which constitute a breach of an insurer's duty of good faith." *Tank v. State Farm Fire & Cas. Co.*, 715 P.2d 1133, 1136 (Wash. 1986). Evidence that an insurer acted in the proscribed manner is evidence of common law bad faith. *See*, *e.g.*, *Coventry Associates v. American States Ins. Co.*, 961 P.2d 933, 936-938 (Wash. 1998); *Onvia*, 196 P.3d at 668-669. Here, Lee argues that the uncontroverted evidence establishes that Defendant's actions ran afoul of the following insurance regulations: WAC-284-330(7), which prohibits an insurer from compelling its insured "to institute or submit to litigation…to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in such actions or proceedings"; WAC-284-330-(2), which requires an insurer to "act reasonably promptly upon communications with respect to claims arising under insurance policies", and WAC-284-330(4), which prohibits an insurer from "[r]efusing to pay claims without conducting a reasonable investigation."

The uncontroverted evidence indisputably establishes that Defendant violated WAC-284-330(7). On December 3, 2019, less than a month after Lee's property was damaged by the fire, Defendant was put on notice that Lee had a claim for lost rental income. Dkt. No. 19, Ex. 8 at 5. Within six weeks of the fire, Defendant had within its possession copies of the lease agreements for the five units affected by the fire. *Id*. at 18. EMA—the company Defendant hired to investigate Lee's claim—sent Defendant a report every month thereafter setting forth Lee's lost rental income and recommending payment. Lee, himself, repeatedly emailed Defendant asking

why the loss of rental income claim had not been paid and explaining how vital the income is to him. Dkt. No. 19, Ex. 28 March 17, 2020 email ("As you know, rental income is my main source of income. My lost rent is a big problem now. Needs [*sic*] help from you company. Thanks."); Dkt. No. 19, Ex. 29 email dated March 23, 2020 ("Please let me know the status of my claim. I have over 4 months of lost rent need [*sic*] to be pay and all the recovery bills. Please reply ASAP. Thanks."); Dkt. No. 19, Ex. 16 email dated April 22, 2020 ("I am a retired person. Rental income is my main source of income. I really need the money. Please speed up the process."); Dkt. No. 19, Ex. 30 email dated May 1, 2020 ("Any update on my claim? Thanks.").

Defendant flatly ignored the requests for payment until July 27, 2020—eight months after the fire—when it finally retained the accounting firm, T.D. Davidson, to review Lee's claim. On September 10, 2020, T.D. Davidson determined that Lee's lost rental income was $7,425 per months (*i.e.*, the same number EMA reported to Defendant seven months earlier) and recommended that Defendant pay Lee $83,540. Defendant still refused to pay on the claim, so Lee was compelled to institute this lawsuit. Finally, *five months after* Lee filed this lawsuit and *seventeen months after* the fire, on April 21, 2021, Defendant paid Plaintiff $118,000 on the lost rent income claim. Dkt. No. 20 at 3.

Defendant's response to the foregoing evidence? Nothing. Much like Defendant failed to respond to the multiple inquiries from Lee (and others) regarding the loss of rental income claim, Defendant does not respond—whatsoever—to Lee's contention that Defendant's delayed payment on the claim constitutes bad faith. Thus, Defendant concedes the argument and Lee is entitled to summary judgment on this issue. *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988) ("Issues raised in a brief which are not support by argument are deemed abandoned."); *Beam v. Colvin*, 2014 WL 5111192, *5 (W.D. Wash. Oct. 10, 2014) (finding party conceded issue by

failing to address it in responsive brief); *Lykins v. Hohnbaum*, 2002 WL 32783973, *3 (D. Or. Feb. 22, 2002) (finding plaintiff conceded dismissal of a claim on motion for summary judgment by not addressing it).

Defendant's handling of the mitigation costs also runs afoul of WAC-284-330(7) because Lee was forced to submit to litigation by ServPro before Defendant paid the claim. The Court finds unpersuasive Defendant's argument that Lee's claim is premature because there "has been no ultimate recovery" in this case. Dkt. No. 20 at 7. It is uncontroverted that Defendant's failure to pay Servpro for the mitigation work—*i.e.* "amounts due under the insurance policy"—forced Lee to "submit to litigation"—*i.e.* the state court action Servpro filed against Lee—and that Defendant ultimately paid approximately $190,000 to settle that litigation—*i.e.* "substantially" more than the amount Defendant originally offered to pay—nothing.

Defendant's actions (or lack thereof) also violate WAC-284-330(2), which requires an insurer to "act reasonably promptly upon communications with respect to claims arising under insurance policies". Lee presents ample evidence demonstrating that Defendant failed to respond to dozens and dozens of phone calls, emails, reports, and letters from multiple entities regarding his insurance claim. Defendant counters that it did not violated WAC-284-330(2) because it identifies two instances when it responded to communication from Lee within 3 or 4 days. This argument borders on the frivolous. To be clear, this is not a simple matter of delayed responses; to the contrary, Defendant failed to respond—*at all*—to repeated communications regarding Lee's claims. That Defendant believes this is an appropriate way to treat its insured is appalling; that Defendant chooses to defend its actions based on the fact that it managed to respond to two emails is the definition of hubris.

Defendant's actions also violated WAC-284-330(4), which prohibits an insurer from "refusing to pay claims without conducting a reasonable investigation." The uncontroverted evidence demonstrates that Defendant failed to pay Lee's lost rental income claim without conducting an investigation—reasonable or otherwise—for eight months, when it finally retained T.D. Davidson to review the claim, and even after T.D. Davidson substantiated Lee's claim on September 10, 2020, Defendant did not pay the claim for another six months. Likewise, Defendant refused to by ServPro's invoice for at least four months before it commenced an internal audit of the invoice.

Lastly, Defendant places great weight on the fact that to date, it has paid $358,004.63 on Lee's claim, $172,256.63 of which was paid before Lee instituted the instant litigation. In making this argument, Defendant fails to recognize that unreasonable delays in payment on a claim can be the basis for a bad faith claim. It is uncontested that Defendant did not make *any* payment towards Lee's claim until March 16, 2020 when it sent him a check for $45,000. This amount was woefully inadequate to cover the costs that Lee had already incurred at that point, including $131,895.46 for ServPro's mitigation work and $29,700 that EMA recommended Defendant pay to cover Lee's lost rental income. Nor did it cover the $131,595.58 that EMA recommended Defendant pay Lee for the required reconstruction work. After eight months of pleading from Lee and, ultimately under the threat of litigation, Defendant finally issued Lee another check for $127,256.63 on July 29, 2020. Throughout those eight months, Defendant did not bother to respond to Lee's repeated requests for information on his claim, let alone provide a reasonable justification for delaying the payments. Nor does Defendant provide such a justification in response to this motion. Accordingly, the fact that Defendant ultimately paid some portion of

Lee's claims does not save it from Lee's bad faith claim. The Court will grant summary judgment on the claim.

B.      **The IFCA Claim**

Lee also moves for summary judgment on his IFCA claim. The IFCA provides that "[a]ny first party claimant to a policy of insurance who is unreasonably denied a claim for coverage or payment of benefits by an insurer may bring an action…to recover the actual damages sustained, together with the costs of the action, including reasonable attorneys' fees and litigation costs[.]" RCW 48.30.015(1). In addition, the IFCA provides for treble damages if the court determines that the insurer has violated any of the regulations set forth in WAC 284-30-330. *Id*. at subsections (3) and (5). Thus, to state a claim under IFCA, Lee must demonstrate either that Defendant unreasonably denied a claim for coverage or that Defendant unreasonably denied payment of benefits. *See Langley v. GEICO General Ins. Co.*, 89 F. Supp. 3d 1083, 1086-87 (E.D. Wash. Feb. 24, 2015) (citing *Ainsworth v. Progressive Cas. Ins. Co*., 377 P.3d 6 (Wn. App. 2014)).

It is undisputed that Defendant owed Lee for his lost rental income and that Defendant did not pay anything on that claim until April 2021—sixteen months after EMA first recommended payment on the claim and five months after this lawsuit was filed. As stated above, Defendant presents no evidence to explain its failure to pay these owed benefits. Thus, Lee is entitled to summary judgment on his IFCA claim.

## V. CONCLUSION

The Court finds that reasonable minds could not disagree that Defendant's conduct in handing Lee's claim constituted bad faith and violated the IFCA. Therefore, the Court HEREBY GRANTS Lee's motion for partial summary judgment on his bad faith and IFCA claims.

Dated this 22nd day of November 2021.

*Barbara J. Rothstein*
Barbara Jacobs Rothstein
U.S. District Court Judge